**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **LLOYD COLBERT,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | No. 17 cv 6237 |
| | ) | |
| **ILLINOIS DEPARTMENT OF** | ) | **Judge Rebecca R. Pallmeyer** |
| **TRANSPORTATION and JAMES McKAY,** | ) | |
| | ) | |
| **Defendants.** | ) | |

<u>**MEMORANDUM ORDER AND OPINION**</u>

After a physical altercation between Plaintiff Lloyd Colbert and his subordinate, Darrin Monroe, both men were dismissed from their employment with Defendant Illinois Department of Transportation ("IDOT"). Plaintiff, who is African-American, alleges that IDOT discriminated against him on the basis of his race, and that his fight with Monroe is mere pretext for his discharge. Plaintiff filed a Charge of Discrimination with the Equal Employment Opportunity Commission in September 2016 in which he alleged he was terminated on the basis of his race and in retaliation for his having filed a complaint with the Illinois Office of the Executive Inspector General ("OEIG") about the incident involving Monroe. Plaintiff then filed this action against Defendants IDOT and James McKay, his direct supervisor, alleging race discrimination in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.*, and 42 U.S.C. §§ 1981, 1983. Plaintiff also asserts that both Defendants retaliated against him for his OEIG report, in violation of the Illinois State Officials and Employees Ethics Act, 5 ILCS 430/15-10. Defendants contend they had non-discriminatory reasons for disciplining and removing Plaintiff, and have asked the court to enter summary judgment on all counts [51]. The parties' failure to identify the person(s) who made the discharge decision for Plaintiff complicates the analysis of this motion. For the reasons explained below, Defendants' motion for summary judgment is granted in part and denied in part.

Plaintiff Colbert was employed by IDOT as a Lead Worker (supervisor) with IDOT's Emergency Traffic Patrol ("ETP") unit until August 19, 2016 when IDOT terminated his employment, allegedly for engaging in a physical altercation with his supervisee, Darin Monroe, one month earlier. (Pl.'s Local Rule 56.1 Additional Statements of Fact ("Pl.'s SOF") [66] ¶ 1.) The conflict between Plaintiff and Monroe began in April 2016 when Plaintiff placed a memorandum in the window of his office reminding ETP employees of IDOT's existing policies regarding relocating disabled vehicles on the roadway. (*Id.* ¶ 4.) Plaintiff claims that Monroe had previously violated the policy (Colbert Dep. 80:1–10, Ex. B to Def.'s SOF), and Plaintiff believes he was angry about the fact that Plaintiff had reprimanded him for that earlier violation. (Pl.'s SOF ¶ 4.) Whatever the reason, Monroe allegedly took issue with the memorandum, leading to a heated conversation with Plaintiff. (*Id.*) Plaintiff testified that he interpreted some of Monroe's statements and actions during this confrontation as threats. (Pl.'s Resp. [66] to Def.'s Local Rule 56.1 Statement of Facts ("Def.'s SOF") [54] ¶¶ 11–13.) The day of the conversation, Plaintiff wrote an email to James ("Jim") McKay, assistant to the patrol manager and Plaintiff's direct supervisor,[2] describing the incident with Monroe, and followed up the next day.[3] (Pl.'s SOF ¶¶ 5, 7; Def.'s SOF ¶¶ 7, 16.) Plaintiff's usual manner of writing up subordinates for rule infractions was to send an email to the patrol manager, Michael Schivarelli, with a copy to McKay. (Def.'s

---

[1]   Defendant IDOT makes evidentiary objections to many of Plaintiff Colbert's Additional Statements of Fact [66]. (*See* Def.'s Reply in Supp. of Mot. for Summ. J. ("Def.'s Reply") [78] at 1–3.) The court will address IDOT's objections, as necessary, in the Discussion.

[2]   Plaintiff testified that normally, lead workers such as himself would report to "lead-lead workers" who ran one of three shifts. (Colbert Dep. 14:3–10.) In 2016, only Zen McHugh and Mark Jercha were lead-lead workers, and because there was no lead-lead worker assigned to the night shift when Plaintiff worked, he instead reported directly to Jim McKay. (Colbert Dep. 11:17–23, 14:20–22.)

[3]   Plaintiff also stated that he talked to Zen McHugh, a lead-lead worker, about the incident, and McHugh said he would handle it. (Def.'s SOF ¶ 19.) Dan Giglio, a fellow lead worker and the union steward, also told Plaintiff that he would talk to Monroe. (Def.'s SOF ¶ 20.)

SOF ¶ 6.)  If necessary, those men would then elevate the matter to the Personnel Manager (at the time, Georgina Syas) to decide whether disciplinary action should be taken.  (*Id.* ¶ 8; Colbert Dep. 57:17–58:3.)  In response to Plaintiff's follow-up conversation, McKay allegedly told Plaintiff that he (McKay) would "handle it."  (Pl.'s SOF ¶ 5.)  After this incident, Monroe apologized to Plaintiff, and Plaintiff accepted the apology.  (Def.'s SOF ¶ 23.)  There was no further tension between Plaintiff and Monroe until July 2016.  (*Id.* ¶ 24.)

## I.     The Physical Altercation

In July 2016, Monroe arrived at work for a sixth consecutive day and learned that he had been assigned to a new patrol area.  (Exs. G, P to Def.'s SOF.)  As Colbert explained in his deposition, ETP workers are assigned to monitor different stretches of highway in the Chicago area.  (Colbert Dep. 61:10–13.)  For example, patrol area 4/5 covered the area of the Kennedy Expressway (I-190, I-90, I-94) and the Dan Ryan Expressway (I-90, I-94) between Fullerton Avenue and 71st Street.  (*Id.* 97:11–14.)  ETP employees who work a sixth straight day are ordinarily permitted to choose their patrol areas for that day; Monroe went to the office to find out why this practice had not been followed.  (*Id.*)  The parties dispute what happened when Monroe reached the office.  According to Plaintiff, Monroe began arguing with Plaintiff about the changed assignment and insulted Plaintiff, calling him a "punk pussy motherfucker" while leaning over Plaintiff's desk.  (Pl.'s SOF ¶ 9; Pl.'s Resp. to Def.'s SOF ¶ 27.)  Plaintiff responded by telling Monroe to go home.  (*Id.*)  Monroe did exit the office, and as Plaintiff began to sign Monroe out of work on the sign-in sheet in his office, Plaintiff asserts, Monroe returned to the office, bumped Plaintiff with his chest, and punched Plaintiff's right cheek.  (Pl.'s SOF ¶ 9.)  Plaintiff grabbed Monroe's wrist and pushed Monroe away.  (*Id.*)  Dan Giglio and Kevin Olson, two other IDOT employees who had entered the office, grabbed Monroe to separate him from Plaintiff, and after Plaintiff pushed Monroe away, Giglio, Olson, and Monroe all fell to the floor.  (*Id.*)

On the day of the incident, July 8, 2016, Darin Monroe recorded his account of the altercation in a memorandum to James McKay as part of the investigative process.  (*See* Ex. P

to Def.'s SOF; *see also* Personnel Policies Ch. 12-2(A), Ex. 9 to Pl's SOF.)  Monroe also wrote his version of the events in a July 8, 2016 witness report to the Illinois State Police.  (Ex. G to Def.'s SOF.)  Monroe wrote that Plaintiff had raised his voice and told Monroe that if he did not like the changed assignment, he could go home.  (Ex. P to Def.'s SOF.)  Monroe recalled that he asked Plaintiff "why [Plaintiff was] acting like a woman," and that Plaintiff responded by jumping out of his seat behind the desk, charging at Monroe, bumping him in the chest, and pushing him. (*Id.*)  At that point, Monroe wrote, Giglio and Olson came in from the hall and pulled Monroe away from Plaintiff, but as they were pulling him away, Plaintiff punched Monroe in the face, and Monroe and the two other men fell to the floor.  (*Id.*)  Because of the fall, Monroe felt a sharp pain in his leg and was not able to stand on his own.  (*Id.*)

Dan Giglio and Kevin Olson, who witnessed the incident, also wrote and signed statements describing the altercation.  (Ex. F to Def.'s SOF.)  Giglio reported that he heard and saw Plaintiff and Monroe arguing, yelling, and pushing each other, so he and Olson got between the men to separate them.  (*Id.*)  Giglio attempted to exit the office, but when Plaintiff and Monroe resumed arguing and pushing each other, Giglio again got between the two and then, "during all the pushing," Giglio, Olson, and Monroe tripped over the rug and fell to the floor.  (*Id.*)  Olson's account is similar: Olson recalled that he was in the office at the time the argument began, but prior to its escalation to a physical altercation, saw Giglio coming down the hallway and went into the hallway to speak to Giglio.  (*Id.*)  As they returned to the office, the argument between Colbert and Monroe "escalated to push and shoving."  (*Id.*)  Olson recalls that he and Giglio tried to separate Colbert and Monroe, but that he (Olson), Monroe, and Giglio tripped over the rug and fell to the floor.  (*Id.*)  Olson reports that "hands [and] arms were going all over so I don't know if they were punches," but he did see Colbert and Monroe "bump each other in the chest."  (*Id.*)

Plaintiff does not dispute that Monroe was taken to the emergency room by ambulance after the altercation.  (Pl.'s Resp. to Def.'s SOF ¶ 41.)  Nor does Plaintiff dispute that he pushed Monroe, though he claims that it was an act of self-defense.  (*Id.* ¶ 30.)  Plaintiff also

acknowledges that police reports were filed by Illinois State Police officers who were present at the ETP building at the time of the altercation, and who had come to the office to see what was going on. (*Id.* ¶¶ 31, 41.) Neither Plaintiff nor Monroe was charged criminally.

## II.    IDOT Policies

IDOT's Personnel Policies Manual lays out the Department's policy regarding disruptive conduct and violence in the workplace. (Personnel Policies Chs. 10, 12.) Plaintiff admits that he received a copy of the Personnel Policies. (Pl.'s Resp. to Def.'s SOF ¶ 65.) The workplace violence policy prohibits "violence, threats of violence, harassment, intimidation, and other behaviors which by intent, action, or outcome threatens, frightens, harms or endangers the safety of others." (Personnel Policies Ch. 12-1.) The policy warns that employees who are violent or who threaten violence "may be removed from the premises and may be subject to disciplinary action up to and including discharge, criminal penalties, or both." (*Id.*) Plaintiff characterizes this as a "zero-tolerance" policy (Pl.'s SOF ¶ 16) that was not enforced evenly, but admits that the words "zero tolerance" do not appear in the policy itself. (Pl.'s Resp. to Def.'s SOF ¶ 64.) The Personnel Policies also prohibit disruptive conduct, which includes "instigating or participating in disruptive behavior, horseplay, interrupting work or impeding the work effort of others." (Personnel Policies Ch. 10-3(E).)

The workplace violence policy also specifies the investigative process that should follow an incident of violence. Any employee who witnesses workplace violence must report it to his supervisor and must subsequently submit a written statement describing the incident. (*Id.* Ch. 12-2.) Supervisors are required to communicate to others up the chain of command that the incident occurred, and are responsible for submitting written reports of incidents of workplace violence to Labor Relations or the Office of Quality, Compliance & Review. (*Id.*) The Labor Relations department decides how to respond to the incident, and, pursuant to the policy, the "department's level of response will be in direct correlation to the severity of the incident." (*Id.*) Labor Relations officials may recommend administrative action, "including the imposition of

discipline, up to and including discharge, and the involvement of local or state law enforcement." (*Id.*)

### III. Plaintiff's Dismissal

After Plaintiff's altercation with Monroe, on July 9, 2016, Zen McHugh, a lead-lead worker, told Plaintiff over the phone to stay home until further notice.[4]  (Pl.'s Resp. to Def.'s SOF ¶ 42.) On July 12, 2016, Plaintiff received a letter signed by Georgina Syas, the Personnel Manager in 2016, on behalf of John Fortmann, the deputy director of highways for Region/District One (covering Chicago and surrounding counties), informing Plaintiff that he had been placed on paid administrative leave.  (*Id.* ¶¶ 43–44.)  McKay received a copy of this letter.  (*Id.* ¶ 44.)  At a pre-disciplinary hearing later in July, Plaintiff was charged with disruptive conduct and violence in the workplace.  (*Id.* ¶¶ 46–47.)  Plaintiff, Syas, Tom Wilcox (a union representative), McKay, Jim Stumpner (the Bureau Chief of Maintenance), and Judy LaPorte (there to record the meeting) attended the pre-disciplinary hearing.  (*Id.* ¶¶ 46, 53–55.)  After the hearing, Plaintiff received a letter dated July 26, 2016 informing him that he was being suspended for up to 30 days without pay, pending a decision regarding whether he would be discharged.  (*Id.* ¶ 60.)  The letter was signed by Georgina Syas on behalf of John Fortmann; McKay and others received copies.  (*Id.*)

Neither party clearly explained who, specifically, is involved in the investigation process leading to a decision to discipline an IDOT employee or who makes the final decision to discharge employees.  Plaintiff does not know, nor did Defendant identify, the individual or individuals who made the final decision to suspend Plaintiff pending discharge.  (*Id.* ¶ 61.)  Defendant explained that disciplinary matters were occasionally elevated to Syas (Def.'s SOF ¶ 8), but the policies suggest that the decision is made, in part, by Labor Relations officials or staff in the Office of Quality, Compliance & Review.  (Personnel Policies Ch. 12.)  Michael Varlotta, IDOT's Labor

---

[4]      The parties' factual submissions suggest that James McKay was higher in the chain of command than lead-lead workers, but it does not appear that lead-lead workers reported directly to him.

Relations Director since early 2017, testified that he has authority to investigate personnel issues and can recommend termination, but for unionized employees like Plaintiff, Varlotta has no authority to make a final disciplinary decision more severe than a 20-day suspension.[5] (Varlotta Dep. 13:7–24, Ex. 2 to Pl.'s SOF.) When the Labor Relations department concludes that an employee should be discharged, the department forwards the information and recommendation to Central Management Services ("CMS"), and someone at CMS (again, the parties do not identify the specific individual) will approve or deny the decision. (*Id.* 14:1–9.) The letter ultimately terminating Plaintiff's employment was signed by Syas on behalf of Fortmann. (Pl.'s Resp. to Def.'s SOF ¶ 62.)

Like Plaintiff, Monroe, also an African American man (*see* Ex. 12 to Pl.'s SOF ¶¶ 11–12; Ex. U to Def.'s SOF), was discharged after the altercation. (*Id.* ¶ 66.) Plaintiff's union filed a grievance on Plaintiff's behalf, and he was offered a Last Chance Agreement in October 2017. (*Id.* ¶ 69.) Had he accepted the agreement, Plaintiff could have returned to work; Plaintiff testified that he chose not to do so because the agreement included a two-year probationary period during which any infraction would result in his dismissal with no right of appeal, and because the agreement did not include an offer of back pay. (Colbert Dep. 178:20–179:4, Ex. B to Def.'s SOF.)

## LEGAL STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). The court "view[s] the record in the light most favorable to [the nonmoving party], and draw[s] all inferences in his

---

[5]     Mr. Varlotta personally oversees Districts Three, Five, and Seven (Plaintiff worked in District One), and supervises employees who are involved in disciplinary decisions for employees in other Districts as well. (Varlotta Dep. 12:1–11.) He testified that his employees usually "deal[ ] with discipline directly," but also stated that he would make the decision to terminate an employee from District One, where Plaintiff worked. (*Id.* 12:8–9, 15:14–20.)

favor." *Petties v. Carter*, 836 F.3d 722, 727 (7th Cir. 2016). Summary judgment should be entered only if the evidence is such that no reasonable jury could return a verdict in favor of the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

<u>**DISCUSSION**</u>

**I.    Abandonment of Claims**

Plaintiff's First Amended Complaint [16] includes four counts: a Title VII race discrimination claim against Defendant IDOT (Count I); a race discrimination claim under 42 U.S.C. §§ 1981 and 1983 against Defendant McKay (Count II); a state law retaliation claim under the Illinois State Officials and Employees Ethics Act, 5 ILCS 430/15-10, against Defendant IDOT (Count III); and the same Illinois state law retaliation claim against Defendant McKay (Count IV). In its motion for summary judgment, Defendant IDOT argued that Counts II and IV against Defendant McKay should be dismissed because Plaintiff never served McKay. (Def.'s Mem. in Supp. of Mot. for Summ. J. ("Def.'s MSJ") [52] at 6.) Defendant also argued that summary judgment is appropriate on Count III, Plaintiff's state law claim against Defendant IDOT, because Plaintiff did not engage in protected activity and, even if he did engage in protected activity, he could not establish a causal connection between the protected activity and his termination because of his own disruptive conduct. (*Id.* at 11–13.) In any case, Defendant IDOT asserts, Plaintiff's state law retaliation claim against the IDOT is barred by sovereign immunity. (*Id.* at 14–15.)

Plaintiff did not respond to these arguments, nor has Plaintiff suggested he has good cause for failing to serve Defendant McKay. *See* FED. R. CIV. P. 4(m). Indeed, Plaintiff's brief does not refer to McKay as a defendant, or address his state law retaliation claims against Defendants IDOT or McKay at all. Accordingly, Plaintiff has abandoned Counts II–IV of his First Amended Complaint. *See Gates v. Bd. of Educ. of the City of Chicago*, 916 F.3d 631, 641 (7th Cir. 2019) ("[Defendant's] motion sought summary judgment on all claims. In opposing summary judgment in the district court, [plaintiff] failed to assert [his retaliation claim]. . . . The district court was not required to address a claim or theory that plaintiff did not assert."); *Nichols v. Michigan*

*City Plan Planning Dep't*, 755 F.3d 594, 600 (7th Cir. 2014) ("The non-moving party waives any arguments that were not raised in its response to the moving party's motion for summary judgment."); *Keck Garrett & Assocs., Inc. v. Nextel Commc'ns, Inc.*, 517 F.3d 476, 487 (7th Cir. 2008) ("Nextel specifically requested summary judgment on the quantum meruit claim. Keck Garrett, however, did not defend that claim in its reply to Nextel's motion for summary judgment. By failing to present its argument to the district court, Keck Garrett abandoned its claim."). The court will address the merits only of Plaintiff's race discrimination claim against Defendant IDOT.

## II.     Title VII Claim Against Defendant IDOT

The primary question in a Title VII discrimination case is "whether the evidence would permit a reasonable factfinder to conclude that the plaintiff's race, ethnicity, sex, religion, or other proscribed factor caused the discharge or other adverse employment action." *Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 765 (7th Cir. 2016). The court must assess the evidence "as a whole, rather than asking whether any particular piece of evidence proves the case by itself." *McDaniel v. Progress Bell Locomotive, Inc.*, 940 F.3d 360, 368 (7th Cir. 2019) (quoting *Ortiz*, 834 F.3d at 765). While courts in this Circuit no longer consider whether evidence of discrimination is "direct" or "indirect," *Ortiz*, 834 F.3d at 766, a "plaintiff may utilize the *McDonnell Douglas* 'burden-shifting framework'" to make a showing of unlawful discrimination. *McDaniel*, 940 F.3d at 368 (quoting *David v. Bd. of Trs. of Cmty. Coll. Dist. No. 508*, 846 F.3d 216, 224 (7th Cir. 2017); *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). "Under this approach, the plaintiff must show evidence that '(1) [he] is a member of a protected class, (2) [he] was meeting the defendant's legitimate expectations, (3) [he] suffered an adverse employment action, and (4) similarly situated employees who were not members of [his] protected class were treated more favorably.'" *McDaniel*, 940 F.3d at 368 (quoting *Skiba v. Illinois Cent. R.R. Co.*, 884 F.3d 708, 719 (7th Cir. 2018)). "If the plaintiff meets each element of [his] prima facie case, 'the burden shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the adverse employment action, at which point the burden shifts back to the plaintiff to submit evidence that the employer's

explanation is pretextual.'" *McDaniel*, 940 F.3d at 368 (quoting *Skiba*, 884 F.3d at 719–20). Notably, however, the court must consider all available evidence because the *McDonnell Douglas* framework is "merely one way of culling the relevant evidence needed to demonstrate whether a reasonable factfinder could conclude that an employer engaged in an adverse employment action" based on a proscribed factor. *McDaniel*, 940 F.3d at 368 (quoting *Johnson v. Advocate Health & Hosps. Corp.*, 892 F.3d 887, 894 (7th Cir. 2018)).

Plaintiff invokes the *McDonnell Douglas* framework in support of his claim of race discrimination. In its motion for summary judgment, Defendant IDOT argues that Plaintiff was discharged not on the basis of race but because he violated IDOT's policies against disruptive conduct and violence in the workplace. Defendant does not, however, contest that Plaintiff is a member of a protected class nor that Plaintiff suffered an adverse employment action. The court therefore turns to whether Plaintiff was meeting the IDOT's legitimate job expectations and whether Plaintiff was treated less favorably than similarly-situated employees.

## A.    IDOT's Legitimate Job Expectations

The inquiry regarding whether an employee was meeting his employer's legitimate expectations focuses on the "employee's performance at the time of his dismissal." *Anders v. Waste Mgmt. of Wisconsin*, 463 F.3d 670, 676 (7th Cir. 2006). This inquiry has less to do with "credentials, work experience, and previous positive job evaluations" than with the employee's "performance at the crucial time when the employment action is taken." *Dear v. Shinseki*, 578 F.3d 605, 610 (7th Cir. 2009); *see also Peters v. Renaissance Hotel Operating Co.*, 307 F.3d 535, 545–46 (7th Cir. 2002) (affirming summary judgment for an employer when the plaintiff employee, although previously having received satisfactory performance evaluations and an employee award, failed to heed his employer's warnings about properly documenting his activity and used employer equipment without permission prior to his termination). "An employee who violates his employer's established policies fails to perform adequately or meet his employer's legitimate expectations." *Hall v. Vill. of Flossmoor Police Dep't*, No. 11 C 5283, 2012 WL 6021659, at *5

(N.D. Ill. Dec. 4, 2012) (citing *Anders*, 463 F.3d at 676 ("It cannot be disputed that [plaintiff's] behavior on November 12 failed to meet [defendant's] 'legitimate expectations' as established by its Code of Conduct and Workplace Violence policy.")).

Defendant argues that Plaintiff did not meet IDOT's legitimate expectations because he violated its policies prohibiting disruptive conduct and violence in the workplace. Defendant does not contend that Plaintiff's job performance was otherwise unsatisfactory. Plaintiff admits that he pushed Monroe during the July 8, 2016 altercation (Def.'s SOF ¶ 30; Pl.'s SOF ¶ 9), and does not dispute that physical altercations in the workplace violate Defendant IDOT's Personnel Policies related to disruptive conduct and violence in the workplace. (*See* Personnel Policies Chs. 10-3, 12-1, 12-3.) Rather, Plaintiff urges that he acted in self-defense. (Pl.'s Resp. to Def.'s SOF ¶ 30.) The court will assume, as Plaintiff contends, that he was acting in self-defense, but notes that IDOT policies do not differentiate between violence used in self-defense and violence initiated by the employee—all violence is prohibited. (*See* Personnel Policies Ch. 12; *see also Sawyer v. Columbia College*, 864 F. Supp. 2d 709 (N.D. Ill. 2012) ("[W]hether one was the aggressor, by words or actions, is of no moment.").) The record shows that, at the time of his discharge, Plaintiff violated multiple IDOT policies by arguing with and pushing his subordinate. *See Hall*, 2012 WL 6021659, at *5; *see also Sawyer*, 864 F. Supp. 2d at 718 ("Even when taken in the light most favorable to Plaintiff, Plaintiff's involvement in a workplace altercation gave the College a sufficient reason to believe he was not meeting reasonable expectations."); *Van Dusen v. Mem'l Hosp. of S. Bend, Inc.*, No. 3:10-CV-255 CAN, 2011 WL 5507109, at *4 (N.D. Ind. Nov. 9, 2011) (concluding that an employee, who admitted to "assault[ing] a coworker in violation of [his employer's] workplace violence policy," was not meeting his employer's legitimate expectations); *Anders*, 463 F.3d at 676 (finding that an employee who walked off the job and then attempted to attack his supervisor violated his employer's code of conduct and workplace violence policy, which meant he did not meet his employer's "legitimate expectations").

Ultimately, however, in a situation in which there is a specific disciplinary infraction leading to discharge, the central question is the fairness of Defendant's response. When, as here, the Plaintiff contends that his employer applied its expectations in a discriminatory manner (*see* Pl.'s Resp. to Def.'s Mot. for Summ. J. ("Pl.'s MSJ Resp.") [65] at 6), the second and fourth elements of the *McDonnell Douglas* framework merge, and the court considers whether the "evidence would establish that the defendant[ ] extended leniency to similarly situated white employees who engaged in similar conduct." *Rodgers v. White*, 657 F.3d 511, 517 (7th Cir. 2012) ("When a black employee produces evidence that he was disciplined more severely than white employees who shared similar shortcomings, the second and fourth elements of the [*McDonnell Douglas* analysis] merge."); *see also Peele v. Country Mut. Ins. Co.*, 288 F.3d 319, 329 (7th Cir. 2002) ("When a plaintiff produces evidence sufficient to raise an inference that an employer applied its legitimate employment expectations in a disparate manner, . . . the second and fourth prongs of *McDonnell Douglas* merge.").

### B.    Similarly Situated Employees

A jury can reasonably infer discrimination "when an employer treats an employee in a protected class less favorably than it treats a similarly-situated employee outside that class." *de Lima Silva v. Dep't of Corr.*, 917 F.3d 546, 559 (7th Cir. 2019) (citing *Coleman v. Donahoe*, 667 F.3d 835, 846 (7th Cir. 2012)). Another employee is similarly situated to the plaintiff if it is possible to eliminate other potentially "explanatory variables, 'such as differing roles, performance histories, or decision-making personnel.'" *McDaniel*, 940 F.3d at 368 (quoting *Coleman*, 667 F.3d at 846). To be similarly situated, other employees "need not be identical in every conceivable way," but they "must be 'directly comparable' to the plaintiff 'in all material respects.'" *Id.* In cases in which the plaintiff "alleges the employer disciplined him more harshly than his comparator, 'the most relevant similarities are those between the employees' alleged misconduct, performance standards, and disciplining supervisor, rather than job descriptions and duties." *de Lima Silva*, 917 F.3d at 559 (quoting *Coleman*, 667 F.3d at 849).

## 1.    Evidentiary Issues with Plaintiff's Proposed Comparators

The court addresses, as an initial matter, evidentiary issues that surround certain episodes Plaintiff has identified as comparable to the one resulting in his discharge (involving J.M., M.J., Z.M., and one incident involving A.D.).  *See Victor v. ELA Area Pub. Library Dist.*, No. 17 CV 7172, 2019 WL 3252232, at *9 (N.D. Ill. July 19, 2019) (quoting *Gunville v. Walker*, 583 F.3d 979, 985 (7th Cir. 2009) ("A party may not rely upon inadmissible hearsay to oppose a motion for summary judgment.")).  Plaintiff claims that J.M., a white highway maintenance driver, punched a motorist and was given only an oral reprimand.  (Pl.'s SOF ¶ 29.)  Plaintiff offers no admissible evidence to support this allegation, instead offering the testimony of M.H., an IDOT lead-lead worker who retired in 2014, from a public hearing before the Illinois Human Rights Commission ("IHRC") in 2018[6] in which M.H. described what he learned about J.M.'s conduct from an email he received while working for IDOT.  (M.H. Test. at 102–03, Ex. 6 to Pl.'s SOF.)  Plaintiff claims, also based on M.H.'s testimony, that A.D. pushed a co-worker, T.S., against a wall, cursed at T.S., and threatened to "kick [T.S.'s] ass" without being disciplined.  (*See* Pl.'s SOF ¶ 30 (citing M.H. Test. at 97–100).)  M.H. was not an IDOT employee when he gave this testimony, and the court assumes he could have given a deposition in this case; but it does not establish disparate treatment in any event because Harrison acknowledged that he himself did not report the incident, nor did the victim.  (*See* M.H. Test. 98:22–23, 99:5–8.)

Plaintiff also proposes M.J. and Z.M., two white lead-lead workers, as comparators; he asserts that neither man was disciplined after they allegedly engaged in a physical altercation

---

[6]    The public hearing was in the case *John E. Stewart Jr. v. Illinois Dep't of Transp.*, Charge No. 2007 CF 2704.  The complainant in that case, an African American IDOT employee, similarly alleged that black IDOT employees were disciplined more severely for violations of the workplace violence policy than their white counterparts.  Plaintiff does not report the outcome of the proceeding, nor could the court find a public record of the order, but Plaintiff quotes the Administrative Law Judge as finding that "the black ETP employee was punished more severely than the white ETP employees who violated the same policy during the same timeframe by committing more egregious conduct."  (*See* Pl.'s MSJ Resp. at 13.)

sometime after 2014.[7]  (Pl.'s SOF ¶ 33.)  Plaintiff testified in his deposition that he did not witness the altercation, but that Z.M. described his fight with M.J. to Plaintiff.  (Colbert Dep. 203:1–205:14.)  Neither party offered testimony from Z.M. or M.J. in this case, and Plaintiff has not provided records documenting the incident or any disciplinary steps that were (or were not) taken.  Neither party commented on Plaintiff's discovery efforts regarding this incident; it was raised in his deposition because Plaintiff identified the incident in his interrogatory responses.  (*Id.* 202:7–15.)  Plaintiff testified that Z.M. said that he grabbed M.J. because M.J. "was acting like an ass," and Z.M. was apparently "fed up with the way [M.J.] was talking to him and treating him." (*Id.* 203:18–20.)  Z.M. told Plaintiff that J.M. "snatched away," (*id.* 204:17–20), and "was yelling at Jim McKay to call the cops." (*Id.* at 203:15–22.)  Dan Giglio and Jim McKay apparently witnessed the incident, but there is no admissible evidence that anyone reported,[8] despite IDOT policies requiring instances of disruptive or violent conduct to be reported up the chain of command (here, likely to the patrol manager Michael Schivarelli) or to Labor Relations.  (*See* Personnel Policies Chs. 10-2, 10-3(Q), 12-2(A)–(D).)  There were no reported injuries, and no one called the police.  (*Id.* 205:1–11.)

Plaintiff has not produced evidence sufficient for the court to determine that Z.M.'s statements to him are admissible.  *See Victor*, 2019 WL 3252232, at *10; *United States v. Hawkins*, 803 F.3d 900, 902 (7th Cir. 2015) (explaining that the proponent of evidence bears the burden of showing it is admissible non-hearsay); FED. R. EVID. 801(d)(2)(D).  Specifically, it is not clear that Z.M. was acting within the scope of his employment when he told Plaintiff about the altercation.  Because this admission does not relate directly to Plaintiff's discipline and discharge,

---

[7]  In Plaintiff's deposition, the date of the incident was said to have been January 2016, but Plaintiff did not testify to the date.  (Colbert Dep. 202:20.)

[8]  Plaintiff cites only to hearsay evidence (M.H.'s IHRC testimony) that the incident was reported to ETP Management.  (*See* Def.'s Resp. to Pl.'s SOF [77] ¶ 33.)  M.H. himself did not witness the event; he heard about it from a lead worker who also may have heard about it second-hand.  (M.H. Test. 109–11.)

the "only requirement" for Z.M.'s statement to be within the scope of his employment with IDOT "is that the subject matter of the admission match the subject matter of the employee's job description." *Aliotta v. Nat'l R.R. Passenger Corp.*, 315 F.3d 756, 762 (7th Cir. 2003) ("While the hiring/firing/promoting/demoting decisionmaking authority of the declarant may be critical in employment cases in which the admission deals with hiring/firing/promoting/demoting-type decisions, no similar requirement exists in other contexts."). Here, however, Plaintiff as the proponent of the evidence has not met his burden of showing that Z.M. told Plaintiff about the altercation "in furtherance of [his] management duties," rather than "for personal reasons." *Victor*, 2019 WL 3252232, at *10. Accordingly, the court declines to consider J.M., Z.M., M.J., or the A.D.-T.S. incidents in the comparator analysis.

### 2. Conduct of Comparable Seriousness

Plaintiff does identify several other potential comparators who, he claims, were treated more favorably than he was after violating IDOT's workplace violence policy.[9] Whether another employee is similarly situated depends on whether the proposed comparator engaged in conduct of "comparable seriousness." *de Lima Silva*, 917 F.3d at 559. A court must consider whether the conduct "violates the same rule or is of a similar nature," *id.*, and any "differentiating or mitigating circumstances." *McDaniel*, 940 F.3d at 369 (quoting *Coleman*, 667 F.3d at 847); *see also Patterson v. Ind. Newspapers, Inc.*, 589 F.3d 357, 365–66 (7th Cir. 2009).

---

[9] Defendant also identifies potential comparators beyond those discussed by Plaintiff in his Local Rule 56.1 Statement of Facts or his reply memorandum. Because Plaintiff does not rely on those individuals as potential comparators, the court will not discuss them here. The parties briefly discuss F.G., a white Highway Maintainer who allegedly "exchang[ed] words with a coworker, shov[ed] a table into that coworker, and [got] into that coworker's face," and was subsequently discharged. (Def.'s MSJ at 10; Pl.'s MSJ Resp. at 14.) In its brief, Defendant cites ¶ 82 of its Local Rule 56.1 Statement of Facts to support the allegations against F.G., but there is no ¶ 82 in that statement. *See Boyce v. Obaisi*, No. 13 C 5746, 2015 WL 5462137, at *2 (N.D. Ill. Sept. 16, 2015) ("[F]acts asserted in a brief but not presented in a Local Rule 56.1 statement are disregarded in resolving a summary judgment motion."). Plaintiff's Local Rule 56.1 Statement of Additional Facts adds no information about F.G., so the court will not further discuss the details of that incident.

Whether Plaintiff and his proposed comparators violated the "same set of rules is not dispositive," *de Lima Silva*, 917 F.3d at 560, because a variety of conduct violates IDOT's workplace violence policy, including physical assault, threats, intimidation, and harassment. (*See* Personnel Policies Ch. 12-3.)  Company discipline rules, while "helpful" to a court comparing different disciplinary sanctions imposed on employees, "are not conclusive indicators of comparable seriousness." *Johnson v. Artim Transp. Sys., Inc.*, 826 F.2d 538, 543 (7th Cir. 1987). Some of the employees that Plaintiff identifies as comparators verbally threatened coworkers or members of the public rather than engaging in physical altercations.  Courts in this Circuit have concluded that physical violence is more serious than threats of violence.  *See, e.g., Coleman*, 667 F.3d at 851 n.3 (citing a Tenth Circuit case finding physical violence to be more serious than verbal threats when explaining that the plaintiff's "alarming statements to a third-party" were "arguably" less serious than her proposed comparator's acts of threatening another employee with a knife while holding that employee to the floor); *Nichols v. Illinois Dep't of Transp.*, 152 F. Supp. 3d 1106, 1135 (N.D. Ill. 2016) ("It goes without saying that actual violence is much more serious and explicit than threats of violence.").  Plaintiff's conduct was quite serious—as a result of the physical altercation with Monroe, police reports were filed, and Monroe was taken by ambulance to the emergency room to address his injuries.  (Def.'s SOF ¶ 41.)  And while Plaintiff claims that the severity of his conduct is mitigated by the fact that he had the right to defend himself (Pl.'s SOF ¶¶ 12, 38), a physical altercation resulting in injuries that required urgent medical attention is more serious than a threat of violence.

Because actual, physical violence is more serious than a threat, the court finds that W.M., a white employee who called his supervisor a racial slur and threatened to "kick" his supervisor's "ass," but who was not physically violent, is not similarly situated to Plaintiff.[10]  (Pl.'s MSJ Resp.

---

[10]     W.M. was also allegedly suspended for one day after telling his subordinate that "the last guy to call a Mother Fucker ended up in the hospital."  (Pl.'s SOF ¶ 25.)  The other allegations against W.M. do not involve threats or workplace violence.  (*Id.* ¶ 26.)

at 9–10; Pl.'s Resp. to Def.'s SOF ¶ 70.)  Nor is M.M., another white employee who threatened to "kick" the same supervisor's "ass" without becoming physically violent, a comparator.  (Pl.'s MSJ Resp. at 10.)  A.A. also threatened his coworkers and was not terminated, but was not physically violent.[11]  (Pl.'s Resp. to Def.'s SOF ¶ 76.)

The remainder of Plaintiff's proposed comparators—R.D., J.P., A.D., and T.B.—did allegedly commit acts of physical violence in the workplace.  First, Plaintiff contends that two white employees, R.D. and J.P., were not discharged or disciplined after a 2004 altercation during which Donovan allegedly "threatened [J.P.] and his family, grabbed [J.P.] around the neck, broke [J.P.]'s gold chain, [and] left [J.P.] with bloody scratches on his neck."  (Pl.'s MSJ Resp. at 9; Pl.'s SOF ¶ 22.)  Plaintiff testified that R.D. struck or grabbed J.P. "by his collar and his chain," and threatened to kill J.P.  (Colbert Dep. 197:10–16, 200:5–14.)  Plaintiff testified that he observed the incident (*id.* 197:15–16), but a document Plaintiff wrote at the time of the event, 14 years earlier, reported that he was in the break room when R.D. grabbed J.P. in an office around the corner.  (*Id.* 198:17–22, 199:2–5; Ex. 10 to Pl.'s SOF.)  Plaintiff cites two memoranda, written on June 13, 2004 when the altercation occurred (*see* Pl.'s SOF ¶ 22), reporting the incident to William Helm, then the patrol manager, but they describe threats rather than a physical assault.  (Exs. 10, 11 to Pl.'s SOF.)  Plaintiff did, however, testify that he saw scratches on J.P.'s neck.  (Colbert Dep. 200:17–18.)  Whether Plaintiff can testify from personal knowledge about physical violence between R.D. and J.P. depends on a credibility determination that is not appropriately made at the summary judgment stage.

Second, Plaintiff cites an incident from 2006 in which A.D. allegedly "threw a live flare into a motorist's vehicle."  (Pl.'s SOF ¶ 30.)  In support, Plaintiff cites IDOT's "Yard Report" (disciplinary record) which states: "Profanity toward motorist/Waved lit flare/Damage to interior of car & burn

---

[11]     IDOT disciplinary records show that in 2011, A.A. was suspended pending discharge after threatening to kill a co-worker and his father, but that the suspension was reduced to 10 days.  (Ex. 13 to Pl.'s SOF at 36.)

injuries to the occupants." (Ex. 13 to Pl.'s SOF at 60.) A.D. was charged with the following: "Misconduct – Conduct Unbecoming State Employee," "Misconduct – Creating A Negative Public Image," and "Poor Work Performance – Endangering The Motoring Public." (*Id.*) As a result, he was suspended for 15 days. (*Id.*) Mr. Varlotta acknowledged this record in his deposition, but noted that DeVita's personnel file did not corroborate that the vehicle's occupants were burned. (Varlotta Dep. 75:24–76:22.) Third, T.B., a white employee, allegedly engaged in violence in the workplace and was suspended for 29 days in 2007. (Pl.'s SOF ¶ 20.) IDOT disciplinary records show that he was charged with "Violence in Workplace – Threat(s): Co-Worker(s)," and "Violence in Workplace – Physical Assault: Co-Worker" after "[h]orseplay escalated (forced co-worker to knee/caused head to strike door)," and R.B. allegedly warned a co-worker that "I'll squeeze you – your head will pop off." (Ex. 13 to Pl.'s SOF at 6.) T.B.'s co-worker, another highway maintainer, was suspended for three days due to the incident. (*Id.* at 5.)

Defendant argues that the incident involving Plaintiff was more severe than the incidents involving R.D., J.P., A.D., and T.B. because Monroe went to the emergency room and the police were involved, unlike in the other cases.[12] It is true that none of the alleged incidents involving Plaintiff's proposed comparators resulted in an emergency room visit, but they did result in physical harm.[13] In any case, "[a] characteristic that distinguishes two employees, regardless of its significance when objectively considered, does not render the employees non-comparable if the employer never considered that characteristic." *Eaton v. Indiana Dep't of Corr.*, 657 F.3d 551,

---

[12]     Plaintiff cites the deposition of Michael Varlotta to suggest that IDOT has admitted that that Plaintiff's conduct was less serious than R.D.'s. (*See* Pl.'s SOF ¶ 23.) While Mr. Varlotta, as the current Labor Relations Director, is authorized to recommend that employees be discharged (Varlotta Dep. 14:1–15), Mr. Varlotta has been in this role only since 2017, and played no part in the decision to terminate Plaintiff or the decision to retain R.D. and J.P.

[13]     For this reason, the incident between M.J. and Z.M. may not be of comparable seriousness to the incident between Plaintiff and Monroe, and so they may not be appropriate comparators even were the evidence supporting the incident admissible. The M.J.-Z.M. altercation seems to violate the same workplace violence rule as Plaintiff's conduct, but neither M.J. nor Z.M. was injured after Z.M. grabbed M.J. (Colbert Dep. 205:1–11.)

559 (7th Cir. 2011). Whether an instance of workplace violence results in injuries seems to matter for purposes of IDOT policy, which distinguishes between physical assault—"[a]cts resulting in intentional physical harm or injury"—and threats, intimidation, or harassment, which do not involve physical harm or injury. (*See* Personnel Policies Ch. 12-3(A).) But no manager involved in Plaintiff's disciplinary process testified in this case, and there is no evidence suggesting that Monroe's injuries or the police involvement were considered in the decision to discharge Plaintiff. Additionally, the document informing Plaintiff of the charges against him does cite specifically to the portion of the workplace violence policy defining physical assault, but does not mention Monroe's hospitalization or the police report. (*See* Ex. M to Def.'s SOF.)

Defendant also argues that the flare incident involving A.D. is not comparable because he was not charged with violence in the workplace. But the nature of the misconduct is just as important as the rule it allegedly violates. *de Lima Silva*, 917 F.3d at 560. Viewing the evidence in the light most favorable to Plaintiff, a reasonable jury could find that burning a motorist with a lit flare is just as serious as a supervisor pushing and injuring a subordinate. In sum, a reasonable jury could find the incidents involving R.D., J.P., A.D., and T.B. to be of comparable seriousness.

### 3. Same Standards of Conduct

Defendant IDOT further contends that R.D., J.P., A.D., and T.B. are not similarly situated to Plaintiff, first, because Plaintiff's conduct involved physical violence between a supervisor and supervisee, and second, because the conduct of Plaintiff's proposed comparators occurred several years ago. The Seventh Circuit has cautioned that "[f]ormal job titles and ranks are not dispositive," and that "an employer cannot insulate itself from claims of racial discrimination by making formalistic distinctions between employees." *Rodgers*, 657 F.3d at 518. "A proposed comparator's position or rank may be important, but only provided that the employer took these factors into account when making the personnel decision in question." *Coleman*, 667 F.3d at 849–50. Here, the workplace violence policy appears to grant Labor Relations discretion in determining the appropriate response to reports of violence. The response "will be in direct

correlation to the severity of the incident," but the policy does not specify which factors increase the severity of an incident. (Personnel Policies Ch. 12-2.)

Defendant seems to argue either that violence between a supervisor and supervisee is more serious than violence between two employees of equal rank, or that Plaintiff should be judged more strictly because he was a supervisor. A reasonable jury could accept both arguments—they make intuitive sense—but Defendant has not offered any evidence that a manager relied on these distinctions when making the discharge decision in this case. The document informing Plaintiff of the charges against him does note that the altercation involved his subordinate, but it does not indicate that the difference in roles affected the charges against Plaintiff or would be a factor relevant to his discipline. (*See* Ex. M to Def.'s SOF.) Moreover, Plaintiff points out that IDOT's Personnel Policies apply equally to all IDOT employees and do not mention supervisory status as a factor to consider in assessing the severity of an incident or the discipline that is warranted. (Pl.'s MSJ Resp. at 14; *see also Coleman*, 667 F.3d at 849 ("[Plaintiff] and her comparators were disciplined not for bad performance but for violating a general workplace rule that applied to employees in all departments and of all ranks. In such misconduct cases (as opposed to performance cases), comparisons between employees with different positions are more likely to be useful.").) Without information to suggest that supervisors are held to a different standard of conduct than non-supervisory workers, or that IDOT decisionmakers consider incidents of workplace violence between a supervisor and supervisee to be more serious than violence between employees of equal rank, the court cannot resolve at the summary judgment stage whether Plaintiff's status as a lead worker means that his conduct should be treated differently than that of his proposed comparators, or that his altercation should be considered more serious.

Defendant IDOT also urges that the altercations involving R.D., J.P., A.D., and T.B. are "completely outside the relevant timeframe" because they occurred too long ago—between 2004 and 2007. (Def.'s Reply. at 2.) Defendant does not identify what it considers to be the relevant

time frame, but seems to argue that, as a categorical matter, a "temporal gap of this magnitude is insufficient to support a claim that similarly situated employees were treated better." (*Id.* at 7.) Neither the cases that Defendant cites, nor any authority the court could uncover, support such a broad rule, however. True, incidents widely separated in time are likely to be less probative, because a time gap makes it more likely that "the difference in treatment was due to changes in policies, personnel, and attitudes over the intervening years." *Coleman v. Robert W. Depke Juvenile Justice Ctr.*, No. 14 CV 2015, 2018 WL 1468999, at *8 (N.D. Ill. Mar. 26, 2018); *see also Bilow v. Much Shelist Freed Denenberg Ament & Rubenstein*, 96 F. Supp. 2d 763, 769 (N.D. Ill. 2000). Thus in *Coleman v. Robert W. Depke Juvenile Justice Center,* where plaintiff was terminated after he was arrested and charged with traffic citations for speeding and illegally transporting an open container of alcohol, and non-traffic citations for unlawful use of weapons and possession of cannabis, the court was unmoved by evidence that, nine years earlier, an employee in similar circumstances had been treated more favorably. 2018 WL 1468999, at *3. That earlier episode involved a different decision maker, and there was no evidence that the defendant's policy with respect to employee arrests for drug or alcohol offenses remained the same over time. *Robert W. Depke*, 2018 WL 1468999, at *8. In *Quick*, the court found that the proposed employees from "years before" were not comparable because they were Spanish-speaking and hired at a time when the department "had a pressing need for Spanish-speaking officers," and before the department "began leaning away from accepting laterals due to bad experiences." *Quick v. City of Fort Wayne*, No. 15 CV 56, 2016 WL 5394457, at *5 (N.D. Ind. Sept. 27, 2016).

In this case, Defendant IDOT provides no explanation aside from the above-mentioned citations to support its argument that Plaintiff's older proposed comparators are immaterial. Defendant notes that Plaintiff presents no evidence that the workplace violence policy has remained the same over time (*see* Def.'s Reply at 10), but the court presumes that Defendant would have more direct access to information about any relevant change in enforcement policy,

but has not presented such evidence. At this stage, the court accepts the cases of R.D., J.P., A.D., and T.B. as appropriate comparators, and considers the relevance of the fact that different decisionmakers may have been involved in the decisions concerning their discipline.

### 4. Same Decisionmaker

Normally, employees must share a common supervisor to be similarly situated. *Coleman*, 667 F.3d at 847. This need not be a common direct supervisor, but the individual responsible for making the disciplinary decision should be the same for any comparison to be meaningful. "When the same supervisor treats an otherwise equivalent employee better, one can often reasonably infer than an unlawful animus was at play." *Id.* On the other hand, if there are different decisionmakers, the inference of discrimination is weaker because decisionmakers "may rely on different factors when deciding whether, and how severely, to discipline an employee." *Id.; see also Little v. Illinois Dep't of Revenue*, 369 F.3d 1007, 1012 (7th Cir. 2004) (explaining that discipline from a different supervisor "sheds no light" on the disciplinary decision). "Whether a comparator is similarly situated is typically a question for the fact finder, unless, of course, the plaintiff has no evidence from which a reasonable fact finder could conclude that the plaintiff has met his burden on this issue." *Johnson v. Advocate Health & Hosps. Corp.*, 892 F.3d 887, 895 (7th Cir. 2018).

Plaintiff urges that the identity of the individual decisionmaker for each of his proposed comparators is irrelevant because IDOT is required to administer discipline in a nondiscriminatory manner regardless of who makes the disciplinary decision. (Pl.'s MSJ Resp. at 12.) Unbiased enforcement of IDOT policies is undoubtedly required, but discrimination is not the only variable that could account for differences in treatment. That is, different supervisors could reasonably come to different conclusions about the severity of an incident or the warranted punishment for reasons other than discriminatory animus. The IDOT workplace violence policy provides no definite guidelines to curb the exercise of discretion in assessing the severity of an incident or the proportionate response. *See Coleman*, 667 F.3d at 847 (explaining that decisionmakers "may

rely on different factors when deciding whether, and how severely, to discipline an employee"). And while discretion could enable a decisionmaker to mask discrimination, it does not make discrimination inevitable.

Neither Plaintiff nor Defendant has identified the individual or individuals who made the decision to terminate Plaintiff's employment, nor any potential decisionmakers within IDOT or CMS who were involved with the disciplinary decisions affecting the others.[14] While Plaintiff bears the initial burden of establishing that "similarly situated employees outside of [his] protected class were treated more favorably by the employer," *David*, 846 F.3d at 225, without clearer evidence of who was involved in disciplining Plaintiff and his proposed comparators, the court cannot decide in favor of either party on the question of whether Plaintiff's proposed comparators were truly similarly situated. The August 2016 letter informing Plaintiff that he had been discharged was signed by Georgina Syas, the Personnel Manager, on behalf of John Fortmann, the Deputy Director of Highways for Region One. (Pl.'s Resp. to Def.'s SOF ¶ 62.) The court might surmise that John Fortmann bears the ultimate responsibility for the decision to terminate Plaintiff, but Defendant has not identified, nor does the record otherwise indicate with certainty, who proposed the discharge. *See Coleman*, 667 F.3d at 848 (explaining that "the issue is not only who proposed the suspension but who was 'responsible' for the decision," which can be evidenced by signing off on the decision of another). Moreover, there is no evidence in the record regarding the length of Fortmann's tenure—that is, it is not clear if he was involved with, or responsible for, making the decisions to retain Plaintiff's proposed comparators.

Additionally, in his deposition, Varlotta stated that the Labor Relations Director decides whether discharge is appropriate and then recommends discharge to CMS, which then authorizes the discharge. (Varlotta Dep. 13:13–14:9.) Varlotta testified that Jane Ryan was the Labor

---

[14]    Plaintiff notes that Jim McKay decided whether to report incidents of workplace violence, at least for incidents involving employees at the ETP yard where Plaintiff worked, but does not dispute that McKay was not the final decisionmaker regarding whether to discharge employees. (Pl.'s Resp. to Def.'s SOF ¶ 63.)

Relations Director at the time of Plaintiff's dismissal. (*Id.* 31:8.) Based on Varlotta's testimony, there is reason to suspect that the individual who made the recommendation to retain R.D., J.P., A.D., and T.B. was not the same person who decided to discharge Plaintiff. Varlotta testified that Colleen Alderman was the Labor Relations Director from the mid- to late-1990s to "probably" around 2008, and after her John Czurnycz, Devra Muench, Kevin Tirey, Jane Ryan, and Rodney Masterson ("somewhere in that timeframe") were subsequent Labor Relations Directors. (*Id.* 94:25–95:23.) But the Labor Relations Director is not, as far as the record shows, the only individual who provides input on disciplinary decisions.

"The point of determining whether different decision makers were responsible is to determine whether two employees were held to different standards by virtue of the different perspectives and expectations of different and independent decision makers." *Perez v. Thorntons, Inc.*, 731 F.3d 699, 707 (7th Cir. 2013). In cases, as here, where multiple individuals were involved in the decision-making process for employee discipline, and the employees are subject to the same standards (here, the workplace violence policy), "an employer cannot defeat [an] inference of impermissible disparate treatment by designating one supervisor as the nominal decision maker for one decision and [an]other supervisor as the nominal decision maker for the other." *Id.* at 708. Due to the lack of clarity in the record, the court finds that there is a genuine issue of material fact regarding whether Plaintiff was disciplined by the same decisionmakers as his proposed comparators, and therefore whether he is similarly situated to employees that were treated more favorably.

## III.    Pretext and Other Evidence of Discriminatory Treatment

Defendant's proposed nondiscriminatory reason for discharging Plaintiff is his violation of IDOT policies against workplace violence. (Def.'s MSJ at 14.) Plaintiff urges that this justification is pretextual based on the comparator evidence discussed above.[15] To establish that an

---

[15] Plaintiff also claims that McHugh called him a racial slur (Colbert Dep. 65:22–67:9), and that M.B., an ETP worker, once used racially-charged language to describe Plaintiff. (*Id.*

employer's proffered reason for the termination is pretextual, a plaintiff must show that the employer did not "honestly believe[ ] the reasons it has offered to explain the discharge." *Coleman*, 667 F.3d 835. The court's concern is not that the "employer's reason was inaccurate or unfair," or that "an employer may be wrong about its employee's performance," rather, the question is whether the employer's proffered reason "was a lie." *Id.* The plaintiff must "identify such weaknesses, implausibilities, inconsistencies, or contradictions in [his employer's] asserted reason that a reasonable person could find it unworthy of credence." *Id.* (quotation omitted).

Especially when a plaintiff argues "that an employer's discipline is meted out in an uneven manner, the similarly-situated inquiry dovetails with the pretext question," and a "showing that similarly situated employees belonging to a different racial group received more favorable treatment can also serve as evidence that the employer's proffered legitimate, nondiscriminatory reason for the adverse job action was a pretext for racial discrimination." *Coleman*, 667 F.3d at 858 (quotations omitted). As explained above, Plaintiff has raised a genuine issue of material fact regarding whether he is similarly situated to white employees who engaged in conduct that violated IDOT's workplace violence policy and were punished less harshly.

As Plaintiff sees things, Defendant IDOT claims to have a "zero tolerance" workplace violence policy requiring dismissal of any employee who violates the policy, but in practice, only African American IDOT employees are dismissed for policy violations. (Pl.'s MSJ Resp. at 13.) Defendant disputes such a strict interpretation of its policies, and Plaintiff admits that IDOT Personnel Policies do not include the words "zero tolerance." (Pl.'s Resp. to Def.'s SOF ¶ 64.) Indeed, the policies state that violators of the workplace violence rules "*may* be removed from the premises and *may* be subject to disciplinary action up to and including discharge, criminal

---

7:10–15.) As far as the record shows, however, M.B. was not involved at all in Plaintiff's dismissal and the extent of McHugh's involvement was to call Plaintiff to tell him not to come to work on the day after the altercation with Monroe. *See Williams v. Seniff*, 342 F.3d 774, 790 (7th Cir. 2003) (explaining that, unless an individual was involved in the decision-making process or provided input into a disciplinary decision, that individual's expression of discriminatory feelings is not evidence that the decision was discriminatory).

penalties, or both." (Personnel Policies Ch. 12-1(C) (emphasis added).) The use of "may," rather than a word connoting mandatory discipline, suggests flexibility in enforcement. Moreover, the policy states that the "department's level of response [to a reported incident] will be in direct correlation to the severity of the incident," indicating that discharge is not the automatic disciplinary response to allegations of violence in the workplace. (*Id.* Ch. 12-2(C).)

The testimony of IDOT employees, however, is less definitive. Michael Varlotta, Giovanni Fulgenzi, Georgina Syas, James McKay, and a few other employees have testified in other cases and described their understandings of IDOT's workplace violence policy. Of these, only Georgina Syas and James McKay were involved in the process leading to Plaintiff's eventual dismissal. Georgina Syas, the IDOT Personnel Manager from roughly 2012 to 2016, testified at the 2018 IHRC hearing that if someone violates the workplace violence policy by engaging in behavior or language "that could be violent, aggressive, threatening," "[t]hey are usually discharged." (Ex. 7 to Pl.'s SOF at 23.) James McKay, who also testified at the 2018 IHRC hearing, understood the workplace violence policy to be zero-tolerance, meaning that anyone who violates it "will be discharged." (Ex. 6 to Pl.'s SOF at 149; *see also* Ex. 7 to Pl.'s SOF at 7 ("[I]t's a zero-tolerance policy meaning that once they go through the investigations and the discipline it's generally going to be a 30-day pending discharge.").) McKay is a supervisor who has no authority to discipline employees, but nonetheless was involved in the process that led to Plaintiff's discharge because he reported the incident.

IDOT employees who were not involved in the decision to discipline Plaintiff also understood the workplace violence policy as one of zero tolerance. Mr. Varlotta testified that "[he] was told workplace violence, zero tolerance," and that a violation "should" result in IDOT seeking termination, but that he could only "speak to what they're doing in 2017," not "what they were doing in 2007." (Varlotta Dep. 46:16–47:6; *see also* Ex. 6 to Pl.'s SOF at 193 ("Violence in the workplace is considered a zero tolerance citation so it would be something that we would attempt to discharge on.").) Plaintiff also offers the 2013 deposition testimony of Giovanni Fulgenzi from

*Nichols v. Illinois Department of Transportation*, in which Fulgenzi said that "violence or threat of violence is an automatic discharge," but that in some cases a discharge decision may be "downgraded and remedial action like [ ] anger management" would be recommended instead. (Fulgenzi Dep. 57:8–20, Ex. 8 to Pl.'s SOF.)  Fulgenzi was the IDOT Personnel Manager from 1998 until 2012 and then was promoted to Bureau Chief of Fiscal Integrity and Investigations with the Office of Quality Compliance and Review.[16]  (*Id.* 18:17–23.)

Viewing the evidence in the light most favorable to Plaintiff, a reasonable jury could find that IDOT's workplace violence policy was applied to Plaintiff in a discriminatory manner regardless of whether it is "zero tolerance."  If the policy is flexible, allowing decisionmakers discretion to decide the appropriate disciplinary response introduces the possibility that discrimination could motivate these decisions, *see Nichols*, 152 F. Supp. 3d at 1137, and underscores the need for Defendant in this case to identify the decisionmakers and present their explanation why discharging Plaintiff in these circumstances was appropriate.  A flexible policy could also show that Plaintiff was entitled to leniency because he was not the initial aggressor in the altercation with Monroe, and Mr. Varlotta's testimony suggests that whether an employee was acting in self-defense is at least potentially relevant to a disciplinary decision.[17]  *See Coleman*,

---

[16]     Former IDOT employees John E. Stewart, Marvin Harrison, and Lloyd Hinton also testified at the 2018 IHRC hearing that they understood the workplace violence policy to be "zero tolerance."  (*See* Ex. 5 to Pl.'s SOF at 54; Ex. 6 to Pl.'s SOF at 60.)  For example, Hinton stated that he understood the zero-tolerance policy to mean that "you can be terminated for verbal, physical, and antagonistic practices," and that "you would be dismissed if you violated it."  (*Id.* at 14, 30–31.)  These men were not involved in the decision to discharge Plaintiff, and only Marvin Harrison worked in a supervisory capacity.

[17]     Plaintiff cites to the deposition testimony of Michael Varlotta to suggest that IDOT has admitted that his conduct during the July 8 incident was justified and that he attempted to defuse the situation.  (Pl.'s SOF ¶¶ 11–12.)  Specifically, Mr. Varlotta stated the following: "Mr. Wilcox stated that although it didn't appear in the witness statements, he had reason to believe from talking to his guys that Mr. Colbert attempted to defuse the situation by putting his hands up and, while he may have chest bumped, was not the aggressor in the situation."  (Varlotta Dep. 22:6–11.)  Statements from Mr. Wilcox and "his guys" are not in the record, however; and while Mr. Varlotta testified that IDOT employees have no duty to run away if attacked, and may defend themselves (Varlotta Dep. 100:23–101:7), he also noted that Plaintiff may have actually escalated

667 F.3d at 855 ("[T]here is an inherent 'fishiness' in an employer's proffered reason when it rests on a policy that does not legitimately apply to the employee who was terminated.").

If IDOT does have a strict zero-tolerance workplace violence policy, a jury could infer discriminatory intent from the fact that not every violation of the policy results in a discharge. *Nichols*, 152 F. Supp. 3d at 1137 ("[D]isparate application of the employer's 'no tolerance policy' is evidence of pretext."). Plaintiff and Monroe, both African American men, were terminated after their physical altercation, but R.D., J.P., A.D., and T.B.[18] were not, and in some cases were not even charged with misconduct. Plaintiff also directs the court to Defendant's interrogatory response stating that only four individuals working at the ETP yard at 35th Street and Normal Avenue in Chicago have been terminated since 2004 for workplace violence, and all of those individuals were African American.[19] (*See* Ex. 12 to Pl.'s SOF ¶¶ 11–12.) The ETP yard may not be the relevant area for this comparison; there is evidence that disciplinary decisions for employees at all yards were made centrally by some combination of Personnel Services, Labor Relations, and CMS. (*See* Ex. 13 to Pl.'s SOF.) On the other hand, managers from each yard are responsible for reporting misconduct up the chain of command, and could discipline employees differently. If the analysis is confined to the ETP yard, the court notes that T.B., one of Plaintiff's proposed comparators, should not be considered because he was based out of the Grayslake yard. The time period of 2004 to the present may also not be the most relevant time

the conflict—"he did not have to respond with the chest bumps or engage in the wrestling regardless of how it happened." (*Id.* 100:7–10.)

[18]     As discussed below, T.B. may have been discharged and reinstated as a result of a Last Chance Agreement.

[19]     The court's own review of IDOT's disciplinary records reveals, however, that one white employee based out of the New Lenox yard was discharged in 2007 for a physical altercation with a co-worker, and three white IDOT workers from the Grayslake, Maintenance, and Oak Brook yards were discharged between 2008 and 2011 for making threats. (Ex. 13 to Pl.'s SOF at 1, 16, 33, 38.) IDOT's disciplinary records further show that one African-American employee from the Harvey yard was discharged and reinstated after a physical altercation with a co-worker, and an African-American employee from the Northside yard was suspended, but not discharged, after threatening a co-worker. (*Id.* at 31, 56.)

period, as there have been changes in at least some of the decision-making personnel during that time. The court nevertheless concludes there is a genuine issue of fact regarding whether IDOT's workplace violence policy was evenly applied.

In sum, the workplace violence policy that is understood by some IDOT supervisors to be "zero tolerance" does not result in the discharge of all employees who violate it, and Plaintiff may have been entitled to leniency if the policy is not, in fact, one of zero tolerance. Moreover, IDOT's own Affirmative Action Plans report that African American males are suspended at higher rates than their representation in the workforce. (*See* Exs. 3, 4 to Pl.'s SOF.) Such evidence may not ultimately show that Plaintiff himself was discriminated against, but the context in which an employee was disciplined can be relevant. *See Ford v. Marion Cty. Sheriff's Office*, 942 F.3d 839, 858 (7th Cir. 2019) ("An employer's general policy and practice with respect to minority employment can be relevant evidence of pretext or discrimination . . . . Yet such evidence must undercut the specific justifications given by the employer. General allegations of an 'ongoing history of discrimination' are not enough to impugn a particular employment decision.'") (quoting *Sublett v. John Wiley & Sons, Inc.*, 463 F.3d 731, 739 (7th Cir. 2006)). *Ortiz* emphasizes that the "sole question that matters" in assessing a Title VII discrimination claim is whether "a reasonable juror could conclude that [Plaintiff] would have kept his job if he had a different [race], and everything else had remained the same." *Ortiz*, 834 F.3d at 764. Plaintiff has presented sufficient evidence to require that a jury answer that question.

Finally, a word about the significance of the Last Chance Agreement: Plaintiff, like his proposed comparator T.B., was offered reinstatement under such an Agreement and could have returned to work. IDOT disciplinary records show that T.B. was suspended for 29 days and was offered a Last Chance Agreement. (See Ex. 13 to Pl.'s SOF at 6.) The parties have not explained whether T.B. was discharged and reinstated as a result of the Last Chance Agreement or if T.B.'s suspension was reduced to 29 days as a result of the agreement. Varlotta testified that there must be a mistake in this record because a 29-day suspension is "not permissible under the

contract" and employees are offered Last Chance Agreements only after a proposed discharge. (Varlotta Dep. 64:1–6.)  Aside from defeating Plaintiff's assertion that no white employees were discharged for violating IDOT's workplace violence policy (*see* Pl.'s MSJ Resp. at 4), T.B.'s Last Chance Agreement may mean that T.B. was not in fact treated more favorably than Plaintiff.  The Last Chance Agreement is relevant for another reason as well:  Plaintiff's decision to decline reinstatement may mean that, should he prevail in this case, his back pay award will be limited to the pay he lost from the date of his suspension without pay until the date he was offered a Last Chance.  Had Plaintiff returned to work when the position was offered to him, there is no reason to assume that he would have violated the Last Chance Agreement and lost the job again later.

## CONCLUSION

Plaintiff Colbert forfeited his retaliation claim against Defendant IDOT and all claims against McKay as a Defendant.  Defendants' motion for summary judgment [51] is granted as to these claims (Counts II–IV).  But Plaintiff has raised a genuine issue of material fact regarding whether he is similarly situated to white IDOT employees who were treated more favorably than him, and whether IDOT's explanation for his discharge was pretextual.  Accordingly, Defendant IDOT's motion for summary judgment on Count I (Title VII race discrimination) [51] is denied.  The parties are encouraged to discuss a settlement.


ENTER:


Date:  February 27, 2020

REBECCA R. PALLMEYER
United States District Judge